IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 17, 2016

**DALTON B. LISTER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Bradley County**
**No. 14-CR-458    Andrew Mark Freiburg, Judge**

**No. E2015-01325-CCA-R3-PC – Filed April 27, 2016**

The Petitioner, Dalton B. Lister, appeals the Bradley County Criminal Court's denial of his petition for post-conviction relief from his convictions for first degree felony murder, attempt to commit aggravated robbery, and conspiracy to commit aggravated robbery and his effective life sentence. The Petitioner contends that the State destroyed evidence, withheld exculpatory evidence, and concealed the existence of an agreement with a codefendant, and that the cumulative effect of the misconduct deprived him of his constitutional right to a fair trial. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

D. Mitchell Bryant, Athens, Tennessee, for the appellant, Dalton B. Lister.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Stephen Crump, District Attorney General; and Andrew D. Watts, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the December 22, 2004 attempted robbery of Julius "K. C." Shapley and Beto Villalobos and the shooting death of Mr. Shapley. After a jury trial, the Petitioner was convicted of first degree felony murder, attempt to commit aggravated robbery, and conspiracy to commit aggravated robbery and sentenced to life in prison. Because trial counsel failed to file a timely motion for a new trial, all issues but sufficiency of the evidence were waived in the direct appeal of the Petitioner's convictions, and this court affirmed the convictions. *See State v. Dalton Lister*, No. E2007-00524-CCA-MR3-CD,

2009 WL 1850882 (Tenn. Crim. App. June 29, 2009) ) ("*Lister I*"), *perm. app. denied* (Tenn. Oct. 19, 2009). The Petitioner sought post-conviction relief on the ground that he received the ineffective assistance of counsel relative to counsel's failure to file a timely motion for a new trial. The post-conviction court granted the Petitioner's delayed appeal, the Petitioner filed a second motion for a new trial, and the court denied his motion. *See State v. Dalton Lister*, No. E2012-00213-CCA-R3-CD, 2013 WL 3717727, at *1 (Tenn. Crim. App. July 12, 2013) ("*Lister II*"), *perm. app. denied* (Tenn. Dec. 26, 2013).

The Petitioner again appealed, alleging that the evidence was insufficient to sustain his convictions, that the trial court erred by (1) admitting the Petitioner's statement to police, (2) not requiring the State to produce Detective Felton's statement to the Tennessee Bureau of Investigation (TBI), and (3) not allowing the Petitioner to cross-examine codefendant Richard Jerger regarding codefendant Jerger's unrelated pending charges. This court affirmed the Petitioner's convictions. *See id.* On September 14, 2014, the Petitioner filed the instant petition for post-conviction relief, arguing that his right to a fair trial was violated by the cumulative effect of three instances of prosecutorial misconduct.

**Post-Conviction Proceedings**

At the post-conviction hearing, Kristie Luffman-Minor, the lead prosecutor at the Petitioner's trial, testified that she advised law enforcement at the crime scene, reviewed the file prior to the grand jury proceedings, participated in the preliminary hearing, argued pretrial motions, and extended plea offers to the codefendants. She said that on the evening of the murder, the police conducted a video-recorded interview with the Petitioner. She said that the Petitioner did not undergo a polygraph examination, although codefendant Tony Kincaid underwent a polygraph examination. Ms. Luffman-Minor stated that the Petitioner was interviewed a second time, that the recording of the second interview was misplaced, and that the recording was subsequently recovered.

Ms. Luffman-Minor testified that she never spoke directly to codefendant Jerger but instead spoke to codefendant Jerger's defense counsel. She stated that she and counsel never discussed codefendant Jerger's testimony and that she told counsel she would "make no deals" with codefendant Jerger in exchange for his testimony. Ms. Luffman-Minor said that codefendant Jerger's and the Petitioner's cases were severed for trial and that codefendant Jerger testified for the State against the Petitioner and the other codefendants. Ms. Luffman-Minor stated that after the severance, she and counsel discussed codefendant Jerger's testifying but that they did not discuss codefendant Jerger's statement to the police or the questions codefendant Jerger would be asked at the Petitioner's trial. Ms. Luffman-Minor said that generally, she prepared witnesses before a trial but that codefendant Jerger was "unique" because he had his own experienced attorney, "so I thought Mr. Jerger was

probably in good hands all the way around." She said that codefendant Jerger "was willing to testify on his own, I mean, with no offer in place. That being said, it seemed safer from the State's position to let his own attorney advise him as to what he should do[.]" Ms. Luffman-Minor stated that to her knowledge, no one at the District Attorney's Office interviewed codefendant Jerger in anticipation of the Petitioner's trial. She said that the Defendant and his codefendants had complete discovery, including codefendant Jerger's prior statements.

Ms. Luffman-Minor testified that then-Assistant District Attorney Stephen Crump[1] conducted codefendant Jerger's direct examination at the trial. She said that to her knowledge, no one in her office spoke to codefendant Heather Massengill about testifying at the trial and that codefendant Massengill's defense was "very much aligned" with that of her codefendants. Although Ms. Luffman-Minor did not recall a discovery issue relative to providing criminal histories of State witnesses, she would not dispute that an issue existed. She noted that many discovery disputes arose during the case. She said that she did not remember a motion hearing regarding the production of codefendant Jerger's criminal history.

After reviewing the hearing transcript on the motion to compel the production of codefendant Jerger's criminal history, Ms. Luffman-Minor testified that she recalled the discovery dispute and that her office requested a National Crime Information Center (NCIC) report on codefendant Jerger on December 30, 2004. When asked why the Petitioner's trial counsel was not provided with a copy of the NCIC report, Ms. Luffman-Minor said, "I don't think that Mr. Jerger [was] one of the witnesses that we were referring to at the court hearing." Ms. Luffman-Minor stated that she believed the parties discussed Beto Villalobos, the victim who survived the shooting, and other witnesses. She agreed that counsel's motion referred to the criminal histories of all of the State's anticipated witnesses but said that at the motion hearing, counsel stated the motion pertained only to a "handful" of witnesses. Ms. Luffman-Minor said that the transcript did not refer specifically to Mr. Jerger. Ms. Luffman-Minor stated that after she spoke to counsel off the record, she concluded that counsel's purpose in requesting the criminal histories was to undermine the credibility of the victims, who were drug dealers, and a witness, who was a prostitute. Ms. Luffman-Minor did not believe counsel intended to use the criminal histories to impeach codefendant Jerger's credibility.

---

[1] At the time of the Petitioner's trial, Stephen Crump was an Assistant District Attorney General. At the time of the post-conviction hearing, he was the District Attorney General for the 10th Judicial District. For simplicity, we will refer to him as "General Crump."

Ms. Luffman-Minor testified she disputed trial counsel's assertion that counsel never had the opportunity to review codefendant Jerger's criminal history. Ms. Luffman-Minor said that her office had an open file discovery policy, that she and counsel reviewed the prosecution's file multiple times, and that she asked counsel whether counsel wanted anything from the file. Ms. Luffman-Minor stated that on several occasions, the detectives working on the case brought their files to the District Attorney's Office for counsel's review. Ms. Luffman-Minor said that the discovery materials were so voluminous that she organized them in three-ring binders.

On cross-examination, Ms. Luffman-Minor testified that no agreement existed between the prosecution and codefendant Jerger at the time codefendant Jerger testified at the Petitioner's trial. She said she knew the facts of codefendant Jerger's case because she was prepared to prosecute the case. She did not believe codefendant Jerger was told that if he testified truthfully, the State would give him "consideration down the road." She said she "was very adamant [that] the State would offer no deals; that [codefendant Jerger] could do the right thing for the sake of doing the right thing, but there would be no deal." She said that General Crump became involved in the case near the time of the Petitioner's trial and that she did not recall General Crump's speaking to codefendant Jerger's counsel. She stated that generally, a codefendant's testifying truthfully was a factor to be considered in subsequent negotiations with the codefendant. Ms. Luffman-Minor said that she did not participate in the final negotiated settlement with codefendant Jerger because she left the District Attorney's Office for a reason unrelated to the case.

Codefendant Jerger's defense counsel testified that he obtained a severance of codefendant Jerger's trial from that of the codefendants. Counsel said he spoke with General Crump before the Petitioner's trial regarding codefendant Jerger's trial testimony. Counsel stated that although he did not remember the substance of the conversation, he remembered the "absence of an agreement." Counsel said that although codefendant Jerger had been charged with first degree felony murder, the proof against codefendant Jerger was "almost non-existent" and that codefendant Jerger's being held on unrelated charges in another county led to "the type of agreement that we reached regarding his testimony." Counsel stated that the agreement was a "no deal deal . . . . [Codefendant Jerger] would testify for the State and the only promise that they would make is that they would consider his cooperation in further evaluation of his case after he testified." Counsel said that when codefendant Jerger testified, counsel was surprised because codefendant Jerger admitted to previously undisclosed "things that he was involved in." Counsel acknowledged that codefendant Jerger's trial testimony differed from codefendant Jerger's three previous police statements and said that counsel did not know which account was true. Counsel did not remember how long codefendant Jerger had been in confinement at the time he pleaded guilty.

4

Codefendant Jerger's plea agreement, waiver of trial by jury, waiver of appeal, and judgments of conviction were received as exhibits. Codefendant Jerger's defense counsel testified that he signed each document, that codefendant Jerger initially was charged with first degree felony murder, and that codefendant Jerger pleaded guilty to reckless homicide, a Class D felony, and to conspiracy to commit aggravated robbery, a Class C felony. Counsel stated that codefendant Jerger received an effective six-year sentence and was released on "time served" and that the result was a "pretty good reduction." Counsel agreed codefendant Jerger testified at the Petitioner's trial that a religious conversion led to his desire to testify. Counsel said that he and codefendant Jerger discussed his possible range of punishment as originally charged.

On cross-examination, codefendant Jerger's defense counsel testified that an "understanding" existed that if codefendant Jerger testified truthfully, the State would consider his cooperation. Counsel said that codefendant Jerger's trial testimony relative to the existence of an agreement with the State was accurate. On redirect examination, counsel testified that codefendant Jerger was mistaken when he said counsel never reviewed the potential sentence codefendant Jerger faced at a trial.

District Attorney General Stephen Crump, the third prosecutor in the Petitioner's trial, testified that Ms. Luffman-Minor asked him to participate in the case near the Petitioner's trial date because John Williams, the second-chair prosecutor, was "a relatively young lawyer." General Crump said that he conducted codefendant Jerger's direct examination. He did not remember whether codefendant Jerger's case had been severed when General Crump began working on the Petitioner's case. General Crump said that discovery problems existed because the Petitioner's counsel did not receive witness statements, law enforcement never provided the statements at issue to the District Attorney's Office, and Detective Felton found the missing statements in his desk drawer. General Crump did not remember whether Detective Felton threw away compact discs containing the statements but knew "there was some issue with Detective Felton." General Crump did not remember whether codefendant Jerger's testimony was important to the State's case, but he agreed that codefendant Jerger's testimony would have been important if it contained information relative to planning and preparation for the crime. General Crump said that to his knowledge, the prosecutors and the codefendants did not discuss severing the cases for trial and testifying for the State but that he was only involved "right before trial."

General Crump said that generally, when he questioned an informant at a trial, he did not prepare the informant to testify. He stated that he would ask the informant's attorney to provide General Crump with the substance of the anticipated testimony and to prepare the informant for a trial. General Crump remembered generally speaking with codefendant Jerger's defense counsel regarding codefendant Jerger's testimony. He did not remember

whether codefendant Jerger had pending charges in another jurisdiction at the time of the Petitioner's trial. He said that no agreement existed with codefendant Jerger and that his practice was not to enter into pretrial agreements in exchange for testimony because it gave a witness incentive to embellish and "undercut . . . already . . . problematic testimony." General Crump said that generally, he determined whether the State would offer consideration for the testimony based upon statements the witness made to law enforcement or to counsel. He said that consideration meant, "At some point in time, because of your cooperation . . . [we] will take that into account in sentencing or in our recommendation."

General Crump testified that it was not his practice before a trial to discuss with a witness the possibility of consideration after testifying because "everybody in the system understands that if you're [going to] testify on behalf of the State . . . there will be some consideration of that given, either by a Court or by the District Attorney's Office." General Crump believed that he told codefendant Jerger's defense counsel and codefendant Jerger, "In the event that you do testify truthfully . . . , at some point in time that will be evaluated when we make a recommendation as to a case that you may have in front of us." General Crump agreed that codefendant Jerger pleaded guilty to a significantly reduced charge and was sentenced to time served. He said that it was "unthinkable" for a defendant charged with first degree felony murder to be released on time served based solely upon testimony in another case and that "there [had] to be some other reason for that, and I don't know if it's a proof issue[.]" He did not remember a meeting with Ms. Luffman-Minor, codefendant Jerger, and counsel. General Crump said he did not extend a plea offer to codefendant Massengill and that any offers would have come from Ms. Luffman-Minor.

On cross-examination, General Crump testified that to his knowledge, no agreement existed between the State and codefendant Jerger "as to outcome or any favorable treatment." General Crump said that to his knowledge, codefendant Jerger testified truthfully at the Petitioner's trial. General Crump stated that had he known or thought a witness testified untruthfully, "I would have dealt with it then."

An audio recording of codefendant Jerger's guilty plea hearing was played for the post-conviction court. In relevant part, the prosecutor asked the trial court to accept a plea to reckless homicide and recommended a four-year sentence suspended to time served. Relative to codefendant Jerger's testifying at the Petitioner's trial, the prosecutor told the court, "Mr. Jerger . . . was truthful and he cooperated with the State, kind of an unwritten, [in]formal agreement was that in exchange for that cooperation, then the State would do all that it could to help him in the State's plea."

Codefendant Massengill's judgments of conviction and codefendant Kincaid's plea agreement, waiver of trial by jury, waiver of appeal, and judgments of conviction were

received as exhibits. Codefendant Massengill was convicted of facilitation of first degree murder, facilitation of attempt to commit aggravated robbery, and conspiracy to commit aggravated robbery, and she was sentenced to seventeen years. Codefendant Kincaid pleaded guilty to attempted aggravated robbery and facilitation of second degree murder, and he was sentenced to twenty-two years.

The Petitioner testified that he was serving a life sentence and that he had become a prison trusty and barber and that he worked in the segregation unit. He said that he had not been disciplined during the ten years he had been in confinement. The Petitioner said codefendant Jerger's trial testimony was false. The Petitioner admitted he went to the victim's hotel because he was angry, drunk, and wanted to fight, but he denied a robbery occurred. Relative to codefendant Jerger's testimony that the Petitioner attempted to obtain a gun before the robbery, the Petitioner said that he sold drugs and had guns and that obtaining another gun was unnecessary. The Petitioner stated that he was a different person at the time of the shooting. The Petitioner characterized the incident leading to the victim's death as "a fight that got completely out of hand."

The Petitioner testified that he lived with Mr. Villalobos in Texas, that Mr. Villalobos was arrested, the Petitioner visited Mr. Villalobos weekly in jail, and that the Petitioner allowed Mr. Villalobos's pregnant girlfriend to stay at the Petitioner's home while Mr. Villalobos was in jail. The Petitioner stated that after Mr. Villalobos's release from jail, the Petitioner gave Mr. Villalobos a car, "got him on his feet," and helped him find housing. The Petitioner said that he moved to Tennessee to get away from "everything and everybody to start all over" but that Mr. Villalobos and the victim followed him.

The Petitioner testified that he and the victim were childhood best friends and that if the Petitioner had robbed the victim, the Petitioner would never have been able to return home to Texas. The Petitioner said that when the victim and Mr. Villalobos came to Tennessee, the Petitioner told them, "Look, I'm through, I'm done, take it back home," and the three of them argued on the telephone for three or four days. The Petitioner said that in the course of these conversations, Mr. Villalobos made "a statement toward me and my daughter," that the Petitioner saw red, and that the Petitioner went to Mr. Villalobos's hotel room to fight him. The Petitioner stated that he asked codefendant Kincaid to accompany him "just to have [the Petitioner's] back" and that he told codefendant Kincaid not to carry a gun.

The Petitioner testified that trial counsel told him codefendant Massengill had been offered a "deal with the devil," which consisted of probation in exchange for severing her case for trial and testifying against the Petitioner. He said that codefendant Massengill declined the offer because she refused to lie about the events leading to the victim's death.

The Petitioner stated that codefendant Jerger testified against him after accepting the same offer extended to codefendant Massengill. The Petitioner said that codefendant Jerger was released three days after the Petitioner was convicted and that it was evident codefendant Jerger had reached a plea agreement with the State. The Petitioner noted codefendant Jerger had thirteen felony convictions and had been to prison several times. The Petitioner said that he knew codefendant Jerger and the State had an agreement but could not prove it at the trial.

Relative to the compact discs Detective Felton threw away, the Petitioner testified that "they can say all day long that it was on a computer . . . Well, what else did this man do? . . . What did he not get caught doing[?]" The Petitioner said that he believed Detective Felton acted in bad faith because Detective Felton admitted in court he intentionally destroyed the discs. The Petitioner stated that he was the only defendant still serving a prison sentence.

Upon examination by the post-conviction court, the Petitioner testified that Michelle Bunting lived with him and that on the evening of the victim's death, the victim asked the Petitioner if he "[had] a girl you all can bring over and drop off[.]" The Petitioner said that Ms. Bunting volunteered to go to the victim's hotel and that the Petitioner did not know she was a prostitute before that evening. The Petitioner stated that he told Ms. Bunting she could not return to his house. The Petitioner said that he and Mr. Villalobos were arguing during this time but that the Petitioner and the victim remained friendly. The Petitioner stated Ms. Bunting testified that she was "excused" from the hotel room before the fight began and that no conspiracy to rob the victim existed. The Petitioner said her testimony conflicted with codefendant Jerger's testimony. The Petitioner said he was frustrated that codefendant Kincaid killed the victim and received a twenty-two-year sentence, that codefendant Massengill received a seventeen-year sentence, that codefendant Jerger received six years' probation after time served, and that the Petitioner received a life sentence. The Petitioner stated that he regretted his decision not to testify because the jury only heard "their side of the story." On cross-examination, the Petitioner testified that he had no proof, only his word, that codefendant Jerger lied during his trial testimony.

The post-conviction court denied relief. The court concluded that all non-constitutional claims raised in the Petitioner's pro se petition had been previously litigated or waived. The court also found that several constitutional claims, including an ineffective assistance claim, were knowingly and voluntarily waived after post-conviction counsel was appointed. The court credited the testimony of Ms. Luffman-Minor, codefendant Jerger's trial counsel, and General Crump, finding that their testimony was "supported by corroboration of the record of this case, the other testimony of fellow post-conviction witnesses, and/or deeply rooted in circumstantial logic." The court also credited the Petitioner's testimony, finding that the Petitioner "was articulate, genuine, and sincere throughout his testimony." The court found that the Petitioner admitted many of his claims

were resolved by the jury's verdict and that the Petitioner was frustrated by his life sentence because the Petitioner did not fire the gun resulting in the victim's death. The court noted the "tortured" procedural history of the case.

Relative to codefendant Jerger's alleged false testimony, the post-conviction court determined that the Petitioner did not offer clear and convincing proof that codefendant Jerger testified falsely. The court found that codefendant Jerger testified at the trial about the events leading to the victim's death and about codefendant Jerger's religious conversion as the motivation for his testimony. The court also found that codefendant Jerger was subject to a thorough cross-examination at the trial, that codefendant Jerger was impeached with "a mountain of . . . evidence," including multiple prior convictions, prior bad acts, and prior inconsistent statements, and that any issues of codefendant Jerger's credibility were resolved by the jury's verdicts. The court determined that the jury, the trial court, and the Tennessee Court of Criminal Appeals had previously considered this issue and that the Petitioner had presented no new allegations or proof.

Relative to the alleged plea agreement between codefendant Jerger and the State at the time of the trial, the post-conviction court found that Ms. Luffman-Minor testified no agreement for leniency existed and that Ms. Luffman-Minor and codefendant Jerger did not discuss such an agreement. The court also found that codefendant Jerger's defense counsel denied having a conversation with the prosecutors about an agreement. The court found that General Crump's involvement in the case was limited and that General Crump, counsel, and codefendant Jerger never discussed an agreement. The court found that the other codefendants's sentences were comparatively favorable. The court noted that codefendant Jerger was likely eligible to be sentenced as a career criminal but that he was sentenced as a Range I, standard offender. The court concluded that the "disparate nature of the sentencing of the four [codefendants] does not, in itself, counter the uncontroverted, direct testimony of all the post-conviction witnesses that no agreement for leniency ever existed." The court noted that codefendant Jerger testified at the trial as to the lack of an agreement with the State.

The post-conviction court determined that the codefendants's convictions must be considered in light of the jury's overall verdict. The court found that the jury assigned culpability to each of the three codefendants when it convicted the codefendants of separate offenses. Relative to codefendant Jerger's guilty plea hearing, the court found that Assistant District Attorney Williams "indicated the existence" of an unwritten and informal agreement in which the State "would do all they could" to help codefendant Jerger in exchange for his cooperation. The court found that the technical record from the trial showed Mr. Williams's involvement in the Petitioner's case was "only tangential," and he was not "actively engaged" in the prosecution. The court found that Mr. Williams's basis of knowledge

9

regarding any agreement was questionable. The court determined that Mr. Williams's phrasing was "more a product to convince the trial court to accept a probationary plea in a homicide case rather than a proclamation of fact binding the prosecution of this case in its entirety." The post-conviction court found that this conclusion was supported by the post-conviction witnesses's testimony that no agreement existed. The court noted codefendant Jerger's defense counsel's testimony that codefendant Jerger's "minimal involvement" in the victim's death "would have precluded any successful prosecution" and found that the reduction in codefendant Jerger's charges was more indicative of the lack of proof than the existence of an agreement. The court found counsel's testimony was consistent with Ms. Luffman-Minor's testimony that given counsel's professional experience and the lack of proof, an absence of pretrial negotiations was not unusual. The court noted that codefendant Jerger's testimony was consistent with a previous statement he made to law enforcement and with codefendant Jerger's voluntary cooperation with law enforcement in the early stages of the investigation.

Relative to the Petitioner's prosecutorial misconduct claim regarding the withholding of criminal histories and to the presentation of codefendant Jerger's false testimony, the post-conviction court found that the availability of criminal history information was "a point of contention" throughout the case, that trial counsel filed motions to compel the disclosure of the criminal history reports, that the State initially claimed it was prohibited from running criminal background checks on prosecution witnesses, that the trial court found the State's position was not supported by law, and that the State later claimed it could not disclose criminal history documents to a defense attorney.

The post-conviction court found that the trial court ordered the disclosure of criminal history reports of "fact witnesses the State intended to rely upon" but that the order was inarticulate. The post-conviction court also found that after a second hearing, the trial court ordered the State to make a reasonable, good faith inquiry into the criminal histories of its witnesses to uncover potentially exculpatory information but that trial counsel "made a later, unrefuted reference" she never received codefendant Jerger's full criminal history. The post-conviction court concluded that the State's position relative to the disclosure of the criminal history documents was "untenable." The post-conviction court noted that "disclosing exculpatory information as required by law does not necessarily entail providing defense counsel with the criminal history documents which remain confidential pursuant to a user licensing agreement." However, the court later noted that "[c]onstitutional obligations override any user agreement into which the district attorney's office may have entered." The court found that the State obtained codefendant Jerger's criminal history on December 30, 2004, and that the State had possession of it for the entirety of the trial.

The post-conviction court concluded that the State's failure to disclose the NCIC report, however, was not material because the only possible unknown fact contained in the NCIC report was codefendant Jerger's arrest in Johnson City on unrelated charges, which information trial counsel obtained through other means before the trial. The court found that because counsel knew of the other charges, she knew all potentially impeaching information relative to codefendant Jerger. The court concluded that in light of the defense's extensive and impeaching cross-examination of codefendant Jerger, the failure to disclose codefendant Jerger's full criminal history was not material and that no error existed because the Petitioner had not discovered new evidence unknown to counsel at the time of trial. Given that the information in the NCIC report was not material, the court concluded that no violation pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), occurred.

Relative to the prosecution's withholding Detective Felton's statement to the Tennessee Bureau of Investigation (TBI) regarding his destroying compact discs containing copies of witness statements, the post-conviction court found that the issue was "fully vetted and explored" by the trial court and the Tennessee Court of Criminal Appeals. The post-conviction court found that the Petitioner did not prove the existence of a prior, memorialized witness statement that required disclosure. The court also found that the Petitioner did not request the post-conviction court to issue process to obtain such a statement. The court determined that Detective Felton was thoroughly cross-examined at the trial about the destruction of the discs and his subsequent demotion. The court noted that although Detective Felton's motives were "troubling," the original digital recordings of the witness statements remained intact and were properly submitted to the jury.

Relative to the cumulative effect of the errors, the court determined that no error existed, and therefore, the cumulative effect of the incidents did not deprive the Petitioner of a fair trial. This appeal followed.

The Petitioner contends that he was denied his constitutional right to a fair trial based upon the cumulative effect of three instances of prosecutorial misconduct. He argues that a law enforcement officer destroyed evidence, the prosecution withheld the criminal history report of codefendant Jerger, and the prosecution allowed codefendant Jerger to testify falsely regarding an agreement for leniency with the State. The State responds that some of these issues were fully litigated in the appeal of the Petitioner's convictions and that the evidence does not preponderate against the post-conviction court's finding no harmful error occurred at the trial.

As a preliminary matter, we note that in the Petitioner's brief, post-conviction counsel framed the issue presented as follows: "The proof in this matter supported the proposition that the State and/or its agent, had committed one or more inappropriate acts, including the

11

willful destruction of evidence and known presentation of perjured testimony, such that the cumulative effect of these acts denied [the Petitioner] a Constitutionally fair trial." Counsel included an additional ground of prosecutorial misconduct, contending that the State withheld the criminal history of codefendant Jerger. However, counsel cites no legal authority supporting his contentions and arguments. *See* T.R.A.P. 27(a)(7); Tenn. Crim. Ct. R. 10(b). Given the already tortured procedural history in this case, we will consider whether the Petitioner was denied his right to a fair trial.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2014). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2014). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001).

## Prosecutorial Misconduct

### *a. Destruction of Evidence*

The Petitioner contends that prosecutorial misconduct occurred when Detective Felton destroyed compact discs containing witness statements. The State responds that this issue was fully litigated in the appeal of the Petitioner's convictions and that consideration of the issue by this court is barred by Tennessee Code Annotated section 40-30-106(h) (2014), because the issue was previously determined by a court of competent jurisdiction. *See Lister II*, 2013 WL 3717727, at *4-5.

In *Lister II*, this court considered whether the witness statements contained on the compact discs should have been suppressed in light of Detective Felton's destroying them, not whether the effect of Detective Felton's actions deprived the Petitioner of a fair trial. Tennessee Code Annotated section 40-30-106(g) states, "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been

12

presented" unless two circumstances inapplicable in this case exist. Because the Petitioner did not raise an issue related to whether Detective Felton's actions deprived him of his right to a fair trial in the appeal of his conviction, consideration of it is waived.

We note, though, that the post-conviction court found, and this court's opinion in *Lister II* reflects, that the Petitioner obtained access to the witness statements in their entirety before the trial, that Detective Felton testified at the Petitioner's trial regarding his destroying the compact discs, and that the Petitioner had the opportunity to cross-examine Detective Felton at the trial. Despite the Petitioner's expressed concern at the post-conviction hearing that Detective Felton may have engaged in undiscovered misconduct, the Petitioner did not present proof of any misconduct. As a result, Detective Felton's actions did not deprive the Petitioner of his right to a fair trial. The Petitioner is not entitled to relief on this basis.

### b. Criminal History

The Petitioner also contends that his right to a fair trial was violated when the State withheld codefendant Jerger's NCIC criminal history report in violation of *Brady v. Maryland*. The State responds that the NCIC report was not material and therefore, no *Brady* violation occurred.

Pursuant to constitutional due process jurisprudence, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87. In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence that provides value for impeachment of a state's witness is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Johnson*, 38 S.W.3d at 58 (quoting *Edgin*, 902 S.W.2d at 390).

In *Kyles v. Whitley*, the Supreme Court observed:

> [The] touchstone of materiality is a "reasonable probability" of a
> different result, and the adjective is important. The question is not whether the

13

defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. at 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

As a preliminary matter, we note that Tennessee Code Annotated section 40-30-106(g) states that a ground for relief is waived when the issue is not raised before a court of competent jurisdiction in which the issue could have been previously presented. Because the Petitioner did not raise an issue related to whether the prosecution's withholding the NCIC report deprived him of his right to a fair trial in the appeal of his conviction, consideration of it at this juncture is waived.

We note, though, that in the appeal of the Petitioner's convictions, this court addressed trial counsel's knowledge of codefendant Jerger's criminal history in its discussion of codefendant Jerger's cross-examination. We agree with the post-conviction court that the information contained in the NCIC report, as applied to this case, was impeachment evidence pursuant to *Bagley*, and that the State's justifications for withholding it were "untenable." This court noted counsel was able to obtain the information contained in the NCIC report before the trial, which supports the post-conviction court's finding that counsel obtained all information in the NCIC report by other means before the trial. This court's opinion in *Lister II* reflects that "the jury was made aware that co-defendant Jerger was involved in an aggravated robbery in Johnson City [and] co-defendant Jerger's lengthy criminal history[.]" 2013 WL 3717727, at *6. The evidence does not preponderate against the post-conviction court's finding that counsel knew all the impeachment evidence contained in the NCIC report before the trial. The Petitioner is not entitled to relief on this basis.

### c. *Agreement between the State and Mr. Jerger*

The Petitioner contends that his right to a fair trial was violated because the State failed to disclose the existence of an agreement for leniency with codefendant Jerger and because codefendant Jerger gave perjured testimony at the trial regarding the agreement. The State responds that the Petitioner is not entitled to relief because he has not proven the existence of an agreement.

As a preliminary matter, we note that Tennessee Code Annotated section 40-30-106(g) states that a ground for relief is waived when the issue is not raised before a court of

competent jurisdiction in which the issue could have been previously presented. Because the Petitioner did not raise an issue in the direct appeal related to whether the State's failure to disclose the existence of an agreement for leniency with codefendant Jerger deprived him of his right to a fair trial in the appeal of his conviction, consideration of it is waived.

We note, though, that this court's opinion in *Lister II* reflects codefendant Jerger testified he had no agreement with the state, which was consistent with post-conviction testimony of the prosecutors and codefendant Jerger's defense counsel and the post-conviction court's finding that no agreement existed. Furthermore, the Petitioner testified at the post-conviction hearing that he had no proof codefendant Jerger lied at the trial. The Petitioner is not entitled to relief on this basis.

### *d. Cumulative Error*

The Petitioner contends that the cumulative effect of the instances of prosecutorial misconduct deprived him of a fair trial. The State responds that the Petitioner has not proven prosecutorial misconduct. We agree with the State.

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015) (*citing State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010)).

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*Hester*, 324 S.W.3d at 76. This court applies cumulative error analysis when two or more errors existed during the trial court proceedings. *Id*. at 77.

Because the Petitioner failed to establish the existence of any misconduct, we conclude that no cumulative error existed. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE